**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CEMEX, INC.<br>10100 Katy Freeway<br>Houston, TX 77055<br><br>        Plaintiff,<br><br>   v.<br><br>DEPARTMENT OF THE INTERIOR<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>INTERIOR BOARD OF LAND APPEALS<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>BUREAU OF LAND MANAGEMENT<br>1849 C Street, N.W.<br>Washington, D.C. 20240, and<br><br>DAVID BERNHARDT, SECRETARY OF<br>THE INTERIOR, in his official capacity<br>1849 C Street, N.W.<br>Washington, D.C. 20240,<br><br>        Defendants. | Civil Action No. 19-1265 |

## COMPLAINT

Plaintiff CEMEX, Inc. ("CEMEX" or "Plaintiff") brings this complaint against the

United States Department of the Interior (the "Department"); the Interior Board of Land Appeals

("IBLA"); the Secretary of the Interior (the "Secretary"), in his official capacity only; and the

Bureau of Land Management ("BLM") (collectively "Defendants").

## I.  INTRODUCTION

1.      Defendants have unlawfully deprived CEMEX of its valuable rights to mine and

produce minerals under two contracts with the United States.  The BLM, after repeatedly making

clear that the production periods under the contracts had not begun to run, abruptly reversed course in 2015 and asserted that the production periods had commenced in 2000—despite the fact that CEMEX could not have legally mined at that time because it lacked the necessary regulatory approvals.  That decision, and the decision of the IBLA affirming it, were arbitrary and capricious, and violated the Administrative Procedure Act ("APA"), Federal Land Policy and Management Act ("FLPMA"), agency regulations, and the Constitution.

2.      In 1990, CEMEX's predecessor, Transmix Corporation, signed two contracts with the BLM giving it the right, subject to certain conditions, to extract a total of 56.16 million tons of sand and gravel at the Soledad Canyon site in Southern California during two consecutive ten-year periods.  Under the contracts, the start of the first ten-year "production period" was triggered by the BLM's approval of the mining plan, with the second ten-year production period commencing immediately after the end of the first production period.  Under the contracts, CEMEX could not commence operations until all of the proposed activities and the mining plan were reviewed and approved by the authorized BLM officer.

3.      In 2000, the BLM issued a Record of Decision ("ROD") *conditionally* approving the mining plan, with the approval expressly subject to CEMEX obtaining all additional required federal and state permits.

4.      Accordingly, from 1990 through 2015, both CEMEX and the BLM proceeded with the understanding that the first production period would begin only when CEMEX had obtained—consistent with the contracts' requirements—all of the federal and state approvals necessary to begin actual mining operations.  The BLM was aware of the fierce local opposition to CEMEX's planned mining.  The BLM repeatedly acknowledged these legal challenges that delayed CEMEX's ability to mine and the commencement of the first production period.

5.     In particular, the agency's record demonstrates the BLM's understanding that the opposition and repeated challenges filed with courts and agencies were interfering with CEMEX's ability to obtain the approvals required for operations and the start of the first production period.  The BLM set forth that understanding in letters to CEMEX, court filings defending the project from opposition by interest groups and local authorities, administrative appeals, submissions to and testimony before Congress, and numerous internal agency documents.  Those statements came both before and after the issuance of the ROD.

6.     In short, everything about the BLM's conduct and statements was consistent with the view that the first production period would commence not upon execution of the ROD, but only when all the required approvals were finalized and the BLM authorized CEMEX— consistent with the contracts—to commence mining operations and thus production at the site, and that the second production period would not commence until the expiration of the first period.  The BLM—for the entire time during which CEMEX incurred millions of dollars in costs to obtain the necessary approvals and develop the project—agreed with CEMEX that the first production period would begin only after all required permits were received.

7.      Then in 2015, the BLM suddenly reversed course and claimed that the first production period had actually started running 15 years earlier upon the BLM's conditional approval of the mining plan.  The BLM thus claimed the first contract had expired in 2010 and the production period for the second contract was halfway over.  It also "cancelled" the second contract for various supposed breaches, and further claimed that CEMEX owed more than $17 million in payments in lieu of production, accruing since 2000.  Contrary to statutory and regulatory requirements, the BLM provided no notice or opportunity to cure.

8.      CEMEX appealed the BLM's decision to the IBLA.  After considering the case for two-and-a-half years, the IBLA agreed that the BLM had acted as though the first production period had not commenced in 2000.  Nonetheless, the IBLA concluded that the first production period did start to run in August 2000, and the first contract therefore had expired by its terms in 2010.  The IBLA similarly found that the production period under the second contract had almost entirely run, and that CEMEX breached the second contract by failing to either produce or make payments in lieu of production, as provided for in the regulations incorporated into the contracts.  But it makes no sense to say that a production period, and any obligations thereunder, began to run when actual operations would have been *unlawful* and were not yet approved by the BLM.

9.      The IBLA found that the BLM had provided adequate notice and hearing under FLPMA prior to cancelling the second contract.  However, it agreed with CEMEX that the BLM failed to provide the notice and opportunity required by its own regulations prior to that cancellation.

10.     By these actions, Defendants unlawfully deprived CEMEX of its rights to realize the benefits of its decades of investment in the permitting, litigation defense, and other costs for the project, which total more than $28 million dollars.  Defendants failed to acknowledge and appropriately consider CEMEX's reasonable reliance on decades of BLM statements and conduct indicating that the first production period would begin only when all the needed permits were issued.  They also failed to provide the notice and opportunity to cure required by statute.

11.     As a result, Defendants violated the APA, FLPMA, and the Due Process Clause of the Fifth Amendment to the Constitution.

## II.  JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

4

13.     CEMEX exhausted its administrative remedies, *see* 43 C.F.R. § 4.403(a), (b)(5), and the IBLA's March 20, 2019 decision (attached as Exhibit 1) constitutes "final agency action" under the APA, 5 U.S.C. § 704.

14.     The Court also has jurisdiction to review the BLM's August 28, 2015 decision (attached as Exhibit 2), because a "preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."  5 U.S.C. § 704.

15.     This action is timely because it is brought within six years of the BLM and IBLA decisions.  *See* 28 U.S.C. § 2401(a).

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States who reside in this judicial district, and because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

17.     CEMEX has standing to bring this action because it has suffered an injury-in-fact that is traceable to Defendants' illegal actions and is redressable through judicial review and the setting aside of those actions and other relief requested.  In particular, Defendants' actions have wrongfully deprived CEMEX of its valuable rights to mine the Soledad site.

18.     This Court is authorized by the APA, 5 U.S.C. §§ 702, 706, as well as the Declaratory Judgment Act, 28 U.S.C. § 2201, to issue the relief (which does not include money damages) sought herein.

### III.  PARTIES

19.     Plaintiff CEMEX and its subsidiaries engage in the manufacturing, sale, and distribution of aggregate, cement, concrete, and other building materials throughout much of the United States.

20.     Defendant Department of the Interior is an executive agency of the United States government, headed by Defendant David Bernhardt, the Secretary of the Interior, who is sued in his official capacity only.

21.     Defendant IBLA, which reviewed the decision of the BLM, acts for the Secretary and the Department on matters involving hearings, appeals, and other review functions.  43 C.F.R. § 4.1.

22.     Defendant BLM is a component agency of the Department.  Pursuant to FLPMA and other statutes, and by delegation from the Secretary, it manages various public lands and subsurface estates, including those at issue in this case.  *See* 43 U.S.C. § 1731(a).  Among the BLM's purposes is to promote "the exploration, development, and disposal of mineral material resources on the public lands."  43 C.F.R. § 3601.1.  The BLM issued the decision (*see* Ex. 2) reviewed by the IBLA, leading to the present action.

## IV.  STATUTORY, REGULATORY, AND CONSTITUTIONAL BACKGROUND

23.     The APA prohibits federal agencies, including Defendants, from taking actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or otherwise "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C), & (D).  Congress has directed that the courts "shall … hold unlawful and set aside agency action, findings, and conclusions" which fail to meet those standards.  5 U.S.C. § 706(2).

24.     Under the APA, when an agency changes its position on an issue, it is required to be "cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).  A failure to do so

makes the agency action arbitrary and capricious.  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015).

25.     Similarly, it is a "central principle of administrative law … that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it."  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

26.     The Materials Act of 1947, 61 Stat. 681, as amended (30 U.S.C. §§ 601–604), authorizes the Secretary to enter contracts for the disposal of minerals on public property.  The Act, together with its implementing regulations at 43 C.F.R. Group 3600, provided the authority for the Secretary to enter into CEMEX's contracts.

27.     Section 302(c) of FLPMA, 43 U.S.C. § 1732(c), governs the suspension, revocation, and cancellation of "instrument[s] providing for the use, occupancy, or development of the public lands," including the mineral contracts in this case.  The statute provides that such "revocation or suspension" can occur only after "notice and hearing."

28.     Under the Fifth Amendment to the United States Constitution, CEMEX cannot be "deprived of [its] property, without due process of law."

## V.  FACTUAL ALLEGATIONS

### A.     The Soledad Canyon Site

29.     The Soledad Canyon project site is a 460-acre area located in unincorporated Los Angeles County, 30 miles north of Los Angeles near the City of Santa Clarita.  *Sierra Club, L.A. Chapter, Santa Clarita Grp.*, 156 IBLA 144, 146 (2002).

7

30.     The site is zoned for heavy manufacturing by Los Angeles County, IBLA AR

39304 (2004 County Surface Mining Permit), and it is adjacent to an aggregate mine that

recently suspended operations.[*]

31.     "Aggregate" means sand, gravel, crushed stone, and related types of materials that

have a wide variety of uses in building and construction, including in producing concrete.

32.     As the IBLA explained, the area "has been used for aggregate mining since the

early 1960s and contains several hundred million tons of aggregate in Federal ownership."  Ex. 1

at 128.

33.     For many years, and as recently as 2013, the California Department of

Conservation has stressed the "critical role" of the site as a source of "needed high-quality

aggregate to a region with intensive and growing demand."  IBLA AR37985 (Cal. Dep't of

Conservation letter).  The BLM has consistently concurred in that position.  IBLA AR13827–29

(1994 BLM letter); IBLA AR36986 (2013 BLM U.S. Senate testimony).

34.     Mining at the project site began in 1968 by a previous operator, and continued

through 1986.  During that time "the previous operator removed several million tons of sand and

gravel."  *Sierra Club*, 156 IBLA at 146.

35.     In the late 1980s, the BLM agreed in the context of settling a mineral trespass

matter with the previous operator to hold competitive bidding for contracts to extract additional

sand and gravel from the site.  *See City of Santa Clarita v. U.S. Dep't of Interior Bd. of Land

Appeals*, No. CV04-1572 DT(FMOX), 2006 WL 4748737, at *2 (C.D. Cal. Feb. 8, 2006).  The

---

[*] Citations styled IBLA AR____ refer to the administrative record submitted by the BLM in
the IBLA proceeding below, which may be paginated differently than the administrative
record submitted by Defendants in this Court.  For the Court's convenience, the decisions
below by the IBLA and the BLM, as well as the contracts and other selected documents, are
attached hereto as exhibits.

BLM settlement specified that there would be two contracts for "consecutive ten-year terms." IBLA AR12949.

36.     In 1989, CEMEX's predecessor, Transmix, won the public competitive sale for these contracts.  IBLA AR13208.

**B.     CEMEX's Contracts**

37.     CEMEX and the United States entered into BLM Contracts CA-20139 and CA-22901 on March 9, 1990.  Ex. 1 at 142.  Copies of the contracts are attached hereto as Exhibits 3 and 4.

38.     The BLM drafted the contracts.  IBLA AR13024–27, 13194–208.

39.     Together, the contracts provide for two consecutive ten-year production periods during which CEMEX has the right to "sever, extract, remove, and process … a total of 56.16 million tons of aggregate from the Contract lands, as well as the right to use and occupy the lands as necessary."  Ex. 1 at 128.

40.     Section 1 of the first contract (CA-20139) provides that "[t]he production period for this contract will be a maximum of ten years with an effective date beginning the day the mining plan, to be submitted by the Purchaser, is approved by the Authorized Officer."  Ex. 3 at IBLA AR13246.

41.     Exhibit A of the contract sets out "Special Stipulations," including that CEMEX "must comply with" various state regulatory requirements, and that "[o]perations will not commence until activities proposed in the mining and reclamation plan are … approved by the Authorized Officer."  Ex. 3 at IBLA AR13250.

42.     Section 6 of the contract provides that "[t]he contract shall expire when the total amount of materials sold has been severed and removed or 10 years from the effective date of the production period unless an extension of time is granted."  Ex. 3 at IBLA AR13248.

43.     Section 1 of the second contract (CA-22901) provides that "[t]he production period for this contract will be a maximum of ten years with an effective date of the day after expiration of Contract Serial No. 20139 between the Purchaser and the Authorized Officer." Section 6 provides that "[t]he contract shall expire when the total amount of materials sold has been severed and removed or 10 years from the effective date of the production period unless an extension of time is granted."  Ex. 4 at IBLA AR13252, 254.

44.     The contracts also required CEMEX to promptly submit a mining and reclamation plan to the BLM for review, as well as to post bonds.  CEMEX did both.  Ex. 1 at 131.

### C.     Post-Contract Developments And Agency Statements

45.     During the following years, CEMEX and Defendants expended substantial resources on the extensive required federal and state permitting processes necessary to begin mining operations and for royalty payments to begin.

46.     CEMEX and Defendants also prevailed in challenges to the bidding process by the prior operator, as well as in overcoming efforts by the prior operator to interfere with preparations to mine the site.  *See* IBLA AR18888–89 (Order Granting in Part Summ. J. and Perm. Inj. at 5–6, *U.S.A. v. Canyon Country Enters.*, No. cv-97-0168-TJH(VAPx) (C.D. Cal. Oct. 20, 1997)).

47.     On multiple occasions after the contracts were signed, the BLM explained, and provided repeated verbal and written reassurances, that the first production period would not start until production was actually legally authorized and that, accordingly, any payment obligations would not be due until such time.

48.     On November 1, 1991, an internal BLM memo stated, after conferring with the Department's Regional Solicitor, that the contracts and regulations are "structured in a way that only allows further payments *if production is authorized*."  IBLA AR13498 (emphasis added)

(attached as Exhibit 5).  The BLM memo further explained that it "is not common practice," and would be "an undue and unplanned burden on any operator" to require payments prior to that point, because, "[i]f it took many years (which seems to be the case), any operator would have been under an extreme financial burden," and "no one would have been able to operate under the contract."  *Id.*

49.  On January 10, 1997, the Department of Justice, on behalf of the BLM, filed a brief in the Central District of California seeking to enjoin the prior occupants of the site from interfering with CEMEX's pre-mining activities.  The United States stated to the court that "the United States will start to receive this revenue *only when [CEMEX] is able to begin its mining operation*."  IBLA AR29781 (Mem. in Supp. of Mot. for Prelim. Inj. at 2, *U.S.A. v. Canyon Country Enters.*, No. cv-97-0168-TJH(VAPx) (C.D. Cal. Jan. 10, 1997)) (emphasis added) (attached as Exhibit 6).  Later, it reiterated that "[a]ny further delay" in "necessary premining activities … will delay the starting date for [CEMEX's] operations, with a consequent delay in the date the United States begins to receive royalties."  Ex. 6 at IBLA AR29803.

50.  The Central District of California granted the preliminary injunction relying in part on these representations, explaining that "the balance of hardships tips in favor of the Government and [CEMEX] because if they are not allowed access to the subject property, [CEMEX]'s pre-mining and mining activities will be further delayed at considerable expense."  IBLA AR30267 (Order at 17, *U.S.A. v. Canyon Country Enters.*, No. cv-97-0168-TJH(VAPx) (C.D. Cal. Feb. 18, 1997)) (attached as Exhibit 7).

51.  On November 24, 1999, the Acting BLM Director wrote to the National Aggregates Association describing the status of the BLM environmental review process and the state permits.  He explained that given the continued delays with state and local permitting,

"substantial regulatory work remains to be done," and that royalties would begin once the project was "in production."  IBLA AR40541 (attached as Exhibit 8).

52.     The BLM's Acting California State Director was even more explicit in a February 2000 letter to the BLM's National Law Enforcement Office.  IBLA AR15742–43 (attached as Exhibit 9).  The State Director wrote that after the initial bid deposit (which CEMEX had made at the time of its original bids):

> [s]ubsequent payments are not required *until after all the appropriate permits are approved at the Federal and State levels*.  Additionally, mining does not start until all permits are approved.  The State of California's [mining statute] as implemented by the County of Los Angeles for this contract, requires approval of a Mining and Reclamation Plan for the proposed mining project ….  In summary, *BLM cannot legally begin to implement collection of scheduled royalty payments without having an approved project*.

Ex. 9 at AR15742 (emphases added); *see also* IBLA AR15731 (Inspector General inquiry).

### D.     The BLM Conditionally Approves The Mining Plan In The ROD

53.     On August 1, 2000, the BLM's District Manager signed the ROD conditionally approving the mining plan and, pursuant to the National Environmental Policy Act (NEPA), the project's Environmental Impact Statement.

54.     As the ROD recognized, at the time of issuance, CEMEX was still legally prohibited from starting mining operations: the ROD expressly provided that approval of the mining plan was subject to (*i.e.*, conditioned upon) CEMEX obtaining the necessary permits and authorizations from other agencies.

55.     In the ROD, the BLM "approve[d]" CEMEX's mining plan subject to several "condition[s] of approval," including "obtain[ing] approvals from the regulatory agencies listed in Table 1 on the following page, and obtain[ing] any other permits or authorizations required by law."  IBLA AR05661 (attached as Exhibit 10).  As the ROD acknowledged, "[t]hese agencies may require additional environmental analyses before granting any permits."  *Id.*

56.     The next page of the ROD listed required approvals from numerous agencies,

including the County of Los Angeles; the Los Angeles County Department of Health; the

California Department of Conservation, Division of Mines and Geology; the California Regional

Water Quality Control Board; the California State Water Resources Control Board; the South

Coast Air Quality Management District; the U.S. Department of the Army, Corps of Engineers;

the California Department of Fish and Game; and the U.S. Fish and Wildlife Service.  Ex. 10 at

IBLA AR05662.

57.     The ROD explicitly recognized that the required permits had not yet been

obtained, and in fact that the Los Angeles County Planning Commission had already *denied* one

permit request, and that an appeal of that decision was pending.  Ex. 10 at IBLA AR05668.

58.     As the IBLA noted in its recent decision, as a result of these outstanding

requirements, "[i]n approving the revised mining plan, the District Manager stated that it would

take 'approximate[ly] … six to nine years' for CEMEX to 'bring [such] a mine on line.'"  Ex. 1

at 131 (alterations original) (quoting ROD).

59.     As recently as in a March 13, 2015 letter to CEMEX, the BLM described this

action as having given its "conditional approval in 2000."  IBLA AR35490; *id.* ("conditionally

approved").

60.     In the very decision CEMEX is challenging herein, the IBLA similarly described

the BLM as having "*conditionally* approved the ROD."  Ex. 1 at 135 (emphasis added).

61.     The conditional nature of the approval was also recognized by courts addressing

subsequent challenges to the ROD.  As the Central District of California explained, the ROD

"approv[ed] the Project subject to CEMEX's compliance with a myriad of mitigation,

monitoring, and bonding requirements."  *City of Santa Clarita v. U.S. Dep't of Interior Bd. of*

13

*Land Appeals*, No. CV04-1572 DT(FMOX), 2006 WL 4748737, at *3 (C.D. Cal. Feb. 8, 2006).

"The BLM also conditioned its approval on CEMEX consulting with and obtaining approval

from regulatory agencies specified in Table 1 of the ROD, … [and] specifically recognized the

possibility that these agencies could impose additional mitigation measures on the Project." *Id.*

62.     The ROD further contemplated 20 years of actual mining operations once all legal

requirements were fully satisfied.  *See, e.g.*, IBLA AR05670 (calculating daily truck trips during

20 years of operations).

63.     The 1600-page Environmental Impact Statement that the ROD also approved was

similarly premised on the impacts of 20 years of mining operations.  IBLA AR01661–3994.

**E.     After The ROD, Defendants And CEMEX Continue For More Than A Decade To Consider The Production Periods As Not Triggered**

64.     Consistent with the plain language of the contract and the ROD, for 15 years

following the "conditional approval" in 2000, the BLM made repeated and affirmative

statements confirming that the first production period had not yet begun, and would not begin

absent the further required permits.

65.     Relatedly, from 2000 through 2007, CEMEX and Defendants worked jointly to

advance the project in the face of continued vociferous opposition, all on the premise that there

would be 20 years of mining operations after all needed permits were secured.  During this

period, CEMEX invested considerable resources to pursue the needed permits and fend off

various legal and political challenges.

66.     Defendants' efforts included participating in litigation against the project by the

City of Santa Clarita and other opponents before the IBLA and in numerous court cases.  *See,*

*e.g.*, *Sierra Club*, 156 IBLA at 168 (affirming ROD); *City of Santa Clarita v. U.S. Dep't of the*

*Interior*, 249 F. App'x 502, 505 (9th Cir. 2007) (affirming summary judgment against challenges

14

to ROD and the U.S. Fish and Wildlife Service's biological opinion); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 944 (9th Cir. 2006) (affirming biological opinion); *Cemex Inc. v. L.A. Cty.*, 166 F. App'x 306, 307–08 (9th Cir. 2006) (affirming rejection of challenge to consent decree between CEMEX, county, and federal government resolving county opposition to Project).  As the BLM recognized in its decision below, "[i]n all of these lawsuits, the Department of the Interior supported and defended CEMEX's interests in the [mineral materials] sales contracts."  Ex. 2 at IBLA AR35131.

67.     All of the litigation proceeded under the understanding shared by all concerned— including the courts—that the production periods had not yet begun to run.  *See, e.g.*, *City of Santa Clarita*, 2006 WL 4748737, at *3 ("The mining would be conducted in two phases that could last up to ten years each."); Order Denying Motion to Remand at 8 n.3, *City of Santa Clarita vs. L.A. Cty. Bd. of Supervisors*, No. CV 04-7355 DT(FMOx) (C.D. Cal. Nov. 15, 2004) ("Given that the federal contracts require the County's approval of the Project before they can be carried out, the federal contracts are directly affected by the resolution of City's present claims.").

68.     In 2002, for instance, in pleadings in one of the lawsuits challenging the project in the Central District of California, Defendants stated that the "state and local permitting processes … are a necessary prerequisite to a determination that the Project is considered lawful."  Fed. Def.'s Reply in Supp. of Mot. for Summ. J. at 7–8, *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, No. 02-412-RMT (C.D. Cal. Feb. 10, 2003).

69.     In 2006, various legal challenges were ongoing, and needed approvals remained outstanding.  Nonetheless, anticipating eventual success on those fronts, CEMEX wished to pursue "certain pre-mining activities" on the site.  IBLA AR35199 (CEMEX Mar. 17, 2006

letter) (attached as Exhibit 11).  Concerned that such work might signify the beginning of the first production period, CEMEX wrote to the BLM, explaining its view that the "'effective date' provision relates to production (i.e., mining) and not pre-mining activities," and "request[ed] confirmation from the BLM that certain pre-mining activities contemplated by CEMEX …will not trigger the effective date" or "the start of royalty payments."  Ex. 11 at IBLA AR35198–99. CEMEX noted that, among other things, this view was consistent with the "condition of approval" in the ROD under which it was required to obtain various outstanding authorizations "relating to actual Project mining."  *Id.* at IBLA AR35201.

70.     In response, BLM's state director expressly stated that he "concur[red]" with CEMEX's assessment and that the specified pre-mining activities "would not trigger the effective date [in] the federal contracts, nor trigger the payment of royalties."  IBLA AR35202–03 (BLM Apr. 17, 2006 letter) (attached as Exhibit 12).  He further confirmed that the mining plan approval in the ROD "was conditioned upon the requirement to obtain additional agency approvals." *Id.*

71.     The last formal legal challenge by the project's opponents concluded in 2009, when the City of Santa Clarita dismissed its appeal of the district court's award of attorney fees against it for bad-faith litigation in attempting to block the project.  *See* Order, *City of Santa Clarita v. L.A. Cty. Bd. of Supervisors*, No. 08-56493 (9th Cir. Mar. 3, 2009).

72.     However, even as CEMEX and Defendants were successful in fending off legal challenges to the project, the City of Santa Clarita persisted in its staunch opposition.  As a result, overlapping with the winding-down of the litigation, CEMEX and the City entered into a "truce" agreement in 2007, in which the parties agreed that CEMEX would temporarily stop

pursuing project entitlements and authorizations and they would together explore possible alternative resolutions to the controversy.  IBLA AR39758–67.

73.     The "truce," which was widely publicized, ended in 2012.  IBLA AR37877, 39758–69, 39770–72.

74.     With full knowledge of the "truce," Defendants continued to clearly express their long-held view that the production periods had not yet begun.

75.     The BLM reiterated—unprompted—its longstanding interpretation in a January 16, 2009, letter to CEMEX requesting a timeline for "necessary pre-mining activities *that will not trigger* the 10-year" production periods, specifically referencing "efforts to secure air and water agency permits."  IBLA AR35208 (emphasis added) (attached as Exhibit 13).

76.     Six months later, on June 11, 2009, the BLM was even more explicit in another letter to CEMEX, asking "when the company intends to proceed with securing the remaining local permits, begin site preparation and pre-production activities, and *most importantly when CEMEX intends to commence mining and processing and royalty payments*."  IBLA AR35209 (emphasis added) (attached as Exhibit 14).

77.     The same pattern continued in subsequent years.  Throughout the duration of the truce and beyond, CEMEX continued discussions with Defendants about the status and future of the project, meeting with the then-Secretary and Deputy Secretary, as well as BLM leadership at the national and state levels.  *See* IBLA AR35460, 36664–65, 37877–78, 38085.

78.     Additionally, during the period of the truce, CEMEX took steps to keep active the permits and approvals it had already obtained and to maintain the active status of its pending permit applications.  After the end of the truce, CEMEX continued to pursue its pre-mining permitting efforts, including: an updated jurisdictional delineation as to the scope of the waters

of the United States in June 2015; a meeting with the California Division of Water Rights in June 2015 on CEMEX's appropriation permit; a July 2015 consultant meeting with the U.S. Army Corps of Engineers; and a July 2015 meeting with the county regional planning department.

79.     As the IBLA explained, the BLM "does not dispute that it failed to suggest … any breach of the Contracts" to CEMEX during this period.  Ex. 1 at 134.

80.     In fact, in 2014, the BLM requested CEMEX's assistance in updating the longstanding reclamation bond for the first contract, the purpose of which was to cover clean-up costs stemming from mining under the contract.  *See, e.g.*, IBLA AR36815–65.

81.     Nor at any time did Defendants request payments in lieu of production.

82.     Further evidence of the BLM's position that the first production period had not yet commenced appears in the agency's approach to various Congressional proposals to address continued opposition to the project.

83.     Acting BLM Deputy Director Steven Ellis testified before the Senate in 2013 in opposition to S. 771, the proposed Soledad Canyon Settlement Act, which would have cancelled the contracts and provided CEMEX with compensation.  He explained that the anticipated 20 years' worth of royalties under the contracts, if left undisturbed by Congress, would be higher than the amounts originally forecast because they would be based on rates at the time of actual future production.  IBLA AR36984 ("As such, actual royalties could be approximately $123 million, based on current royalty rates in the range of $1.50 per ton.").  On behalf of the agency, he explained that, as a result, the proposed bill would lead to a loss compared to what the government would receive with 20 years of mining, complaining that it would "only account[] for the amount of sand and gravel that is produced during the first 10 years of the two 10-year

contracts." IBLA AR36985–86; *see also* IBLA AR37255 (July 10, 2013 BLM memorandum discussing reserves remaining "in 20 years after the current contracts expire").

84. There are several other similar documents in the record, both internal to the BLM and public. *See, e.g.*, IBLA AR38245 (2012 BLM strategy memo including possible path forward for full production "in accordance with [the] contracts"); IBLA AR37877–80 (2013 BLM summary memo continuing to refer to "20 year mining term" and analyzing options including production under the "contracts," plural); IBLA AR35951, 968 (2014 BLM emails discussing 20-year royalty values); IBLA AR36332–33 (2014 BLM internal email objecting to proposed legislation because it failed to account for the "full cost and compensation to the company and the federal government" of cancelling the contracts).

85. BLM's reports on other proposed Soledad Canyon legislation likewise stressed this rationale—the loss of 20 years of royalties for 56 million tons of actual production to the United States if CEMEX's valid contracts were canceled by Congress. IBLA AR36973–80 (BLM Nov. 2012 report on S. 759); IBLA AR38377–84 (BLM June 2012 report on S. 759); IBLA AR38487–92 (BLM May 2011 report on S. 759); IBLA AR38621–25 (BLM Jan. 2010 report on H.R. 4332); IBLA AR38696–720 (BLM May 2008 report on H.R. 5887).

**F.    The BLM Terminates CEMEX's Contracts**

86. By 2015, it became clear that no legislative resolution was forthcoming, and CEMEX continued its efforts to pursue the remaining needed permits to begin actual mining operations.

87. This led to a February 25, 2015 meeting between CEMEX and the BLM, followed by a series of correspondence and further meetings between the parties relating to the status of the project.

19

88.     Among the correspondence from the BLM was a March 13, 2015 letter to

CEMEX in which the BLM suggested, for the first time, that CEMEX had not exercised

"diligence" in fulfilling the terms of the contracts, purportedly "mak[ing] a process to consider

cancellation of the contracts legally available."  IBLA AR35490.

89.     CEMEX responded on March 27, 2015, specifically asking the BLM whether the

agency's March 13, 2015 letter was intended as a notice of cancellation under 43 C.F.R.

§ 3601.62, and if so, requesting a formal notice and that CEMEX "be allowed its full rights to

address and cure any alleged default, to the extent there is any."  IBLA AR35459–62.

90.     In its response, the BLM instead "officially request[ed]" additional documentation

about CEMEX's permitting efforts.  IBLA AR35463.

91.     On August 28, 2015, the BLM's California staff held a meeting with CEMEX at

the agency's state office.  There, they presented CEMEX with an already signed BLM decision

purporting to terminate CEMEX's interests by various mechanisms.

92.     The BLM gave no notice, nor an opportunity to cure, any alleged default.

93.     In the decision, the agency purported to announce a "rescission" or "withdrawal"

from the contracts, or a decree that they had never come into effect at all.  Ex. 2 at IBLA

AR35139.

94.     Alternatively, the BLM posited that the first contract had "expired" because the

initial ten-year production term began on August 1, 2000, when the ROD was signed, and thus

expired in 2010.  Under similar reasoning, the BLM purported to "terminate" the second contract

for an alleged breach.  As justification, the BLM stated that CEMEX had failed to "conduct pre-

production activities"; secure required permits; make production payments; invoke the force

majeure clause; and respond to the BLM's requests for information.  Ex. 2 at IBLA AR35141–46.

95.     The BLM's August 2015 decision acknowledged that the ROD required "approvals by other regulatory agencies before commencing operations on the project site," and did not dispute that those approvals were outstanding when the ROD was issued.  Ex. 2 at IBLA AR35130, 142.  However, the BLM concluded that "[t]he conditions of approval are limitations on CEMEX's ability to act on BLM's approval, but do not change the date of BLM's approval or the effective date of the contracts."  *Id.* at IBLA AR35142.

96.     The BLM's decision acknowledged only one of the agency's many past statements that the production period had not yet begun—the 2006 letter.  Ex. 2 at IBLA AR35140.  With respect to that document, the BLM characterized it as granting "allowances … about when the contract would be effective."  *Id.* at IBLA AR35141.

97.     Based on its new position that the first production period had actually begun 15 years earlier, the BLM announced that CEMEX owed "approximately $17.5 million" of payments in lieu of production, in addition to the bid deposit of $700,000, which it would retain.  Ex. 2 at IBLA AR35146.  It similarly stated that CEMEX would forfeit the performance bonds provided under each of the contracts—both of which had been recently renewed and updated.  *Id.*; *see supra* ¶ 80.

98.     The BLM had never before demanded payments in lieu of production, and CEMEX had not made any, because, as the BLM had repeatedly stated, the first production period had not commenced.

**G.     CEMEX Appeals To The IBLA**

99.     On September 28, 2015, CEMEX filed a timely notice of administrative appeal to the IBLA.  *See* 43 C.F.R. § 4.411(a).

21

100.     At the same time, CEMEX petitioned the IBLA for a stay of the BLM decision.

*See* 43 C.F.R. § 4.21(b).  BLM did not oppose the stay, which the IBLA granted in part on

November 6, 2015.  Order Granting Pet. for Stay in Part, *CEMEX, Inc.*, No. 2015-266 (IBLA

Nov. 6, 2015).  The IBLA concluded that CEMEX was likely to succeed on the merits of its

argument that it had not been afforded the required notice to rescind, withdraw, or terminate the

second contract, and further held that the public interest and balance of harms supported staying

that portion of the BLM decision.  *Id.* at 11–12, 28.  The IBLA, however, held it was likely the

BLM would prevail as to the first contract, on the "sole basis that the contract expired."  *Id.* at

28.  Accordingly, the IBLA declined to stay that portion of the BLM decision.

101.     Briefing before the IBLA was completed on September 26, 2016.

**H.     The IBLA Concludes That The Twenty-Year Production Period Began More Than Eighteen Years Ago**

102.     On March 20, 2019, the IBLA issued its decision, concluding that the first

production period had actually begun with the signing of the ROD on August 1, 2000.  Ex. 1 at

125, 127.  The IBLA held that the first contract had expired under its own terms with the end of

the initial ten-year production period, and that CEMEX breached the second contract for failure

to make payments in lieu of production from 2010 forward.  *Id.* at 162–64.

103.     The IBLA also held that there was no failure to provide notice and opportunity to

cure that breach under FLPMA, but that the BLM had failed to satisfy its regulatory obligation to

provide notice and opportunity to cure.  Ex. 1 at 165–171.  On that basis, the IBLA remanded in

part to allow the BLM to provide the required notice and opportunity for CEMEX to cure the

breach—*i.e.*, to make payments in lieu of production from 2010 forward.

104.     The IBLA reached the factual conclusion that, according to the evidence, the

BLM's long-standing position had been that "the production period had not yet commenced."

The IBLA rejected the BLM's contrary assertions that it had not changed positions at all but had simply granted a "waiver" of the contract's requirements in 2006, rather than affirming CEMEX's view of the triggering of the production periods under the contracts.  Ex. 1 at 148.

105.    The IBLA similarly found that as late as 2014, "both BLM and CEMEX have acted as if the production periods did not commence when BLM approved the ROD" in 2000, and that there was a "mutual understanding" to that effect, one that "to some extent" "persist[ed]" even in the BLM's 2015 decision.  Ex. 1 at 149–50.

106.    Nonetheless, the IBLA upheld the BLM's flip-flop, deeming it "sufficient" that the BLM explained that it had previously "agreed to allowances sought by CEMEX as to when" the production period became effective "in reliance on CEMEX's assertions of diligence."  Ex. 1 at 148–49.

107.    The IBLA further concluded that, contrary to the BLM's claim, the record "does not establish a lack of reasonable diligence in pursuit" of production on the part of CEMEX.  Ex. 1 at 161.

108.    The IBLA never addressed CEMEX's arguments about the company's years of reasonable reliance on the BLM's repeated statements across decades that the first production period would begin when all permits were obtained.

109.    The IBLA similarly failed to address CEMEX's argument that Defendants' newfound construction of the ROD was commercially implausible, in that it presumes an operator would enter into an agreement that contemplated performance based on production for an unknown number of years before it was even able to lawfully begin mining operations.

110.    The IBLA concluded that "[t]here is no basis for equating the approval of the plan spoken of *in the Contract* with the approvals spoken of *in the ROD* that are necessary before

operations can begin," and found it unnecessary to consider the "course of conduct of the parties."  Ex. 1 at 146–47.

111.    The IBLA also held that Defendants were not equitably estopped from asserting that the production periods had begun in 2000, concluding that "[t]here is no evidence in the record of an affirmative misrepresentation or concealment of material facts by BLM," and that estoppel would result in affording "CEMEX a right to which it is not authorized by law."  Ex. 1 at 153.

112.    While the appeal was pending before the IBLA, Congress passed legislation providing that "[t]he mineral estate identified in Bureau of Land Management contracts number CA 20139 and CA 22901 is hereby withdrawn from all forms of mineral entry authority of the Secretary, *subject to valid existing rights*."  Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, tit. I, div. G, sec. 122, 132 Stat. 348, 662 (emphasis added).  This law does not preclude CEMEX from production under its contracts, which the IBLA found were valid and in effect.

## COUNT I
### (Administrative Procedure Act – Arbitrary and Capricious Action)

113.    CEMEX incorporates paragraphs 1–112 as if fully set forth herein.

114.    The APA requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

115.    The language, structure, and purpose of the contracts and the ROD all demonstrate that the first production period did not commence in 2000 upon the *conditional* approval in the ROD, and that any contrary interpretation is incompatible with well-established legal principles of contract interpretation.

24

116.    Any ambiguity in the contracts must be construed in favor of CEMEX and against the government, which was the drafter.  *See* IBLA AR13024–27 (1988 contract stipulations as set out in invitation to bid); IBLA AR13194–208 (1989 BLM transmittal of draft contracts).

117.    It was arbitrary and capricious agency action for the BLM in 2015 to announce a new, contrary position for the first time, that the 20 years of production periods actually had begun running *15 years* earlier, notwithstanding the BLM's explicit representations to the contrary, and without so much as a hint along the way.

118.    CEMEX reasonably relied on the BLM's repeated representations that the production periods under the contracts would not begin until all necessary permits had been obtained, investing substantial sums—more than $28 million—and resources into protecting the project from decades of legal challenges and in pursuing the myriad required permits and approvals from various federal, state, and local agencies.

119.    The BLM's statements were all consistent with the expressly conditional nature of the approval in the ROD, and confirmed by the fact that the ROD, as well as the extensive Environmental Impact Statement it approved, clearly contemplated 20 years of active mining operations after the remaining approvals were secured.

120.    The IBLA unreasonably concluded that it did not have to consider the "course of conduct of the parties" because there was "*no ambiguity*" in what it meant for the mining plan to be "approved."  Ex. 1 at 147.  That view cannot be squared with the fact that under years of intense scrutiny and debate, as the IBLA admitted, everyone involved read the contracts and the ROD a different way until the BLM's 2015 reversal.  Indeed, only on rare occasions did the question even arise whether it might be reasonable to read the contracts as Defendants do now— and when that happened, the unanimous answer was always "no."

121.     Additionally, neither the BLM nor the IBLA sufficiently or adequately considered or accounted for the "serious reliance interests" engendered by the agency's behavior from 1990 through 2015, *Encino Motorcars*, 136 S. Ct. at 2126 (quoting *Fox Television Stations*, 556 U.S. at 515), nor did the BLM or the IBLA adequately explain the BLM's change of position, *id*.

122.     These flaws are exacerbated by the IBLA's agreement that the evidence "does not establish a lack of reasonable diligence in pursuit" of production on the part of CEMEX.  Ex. 1 at 161.

123.     The new interpretation is also arbitrary and capricious because it would have required payments by CEMEX beginning upon the ROD's conditional approval, when, as the ROD itself acknowledged, it would be years before the permits needed for legal operations could possibly be obtained.

124.     Accordingly, the IBLA acted arbitrarily and unreasonably in concluding that "[t]here is no basis for equating the approval of the plan spoken of *in the Contract* with the approvals spoken of *in the ROD* that are necessary before operations can begin."  Ex. 1 at 146.

125.     The IBLA also acted arbitrarily and unreasonably by failing to even address the argument that its newfound construction of the ROD was commercially implausible, assuming an operator would enter into an agreement under which it had to make payments based on production for an unknown number of years before it was even able to lawfully begin mining operations.

126.     The outcome is also contrary to the BLM's mission—productive use of resources on federal lands, *see* 43 C.F.R. § 3601.1—and to the BLM's official long-standing position—repeated in its decision below—that it is in "the public interest" to "develop[] the sand, gravel, and aggregate resources from the Soledad Canyon," Ex. 2 at AR35140.

127.     As a result, Defendants' actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, *see* 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, *see id.* § 706(2)(C), entitling CEMEX to the relief requested below.

## COUNT II
### (Administrative Procedure Act – Without Observance of Required Process)

128.     CEMEX incorporates paragraphs 1–112 as if fully set forth herein.

129.     The APA requires courts to set aside agency action undertaken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

130.     Defendants' actions violated the procedures required by Section 302(c) of FLPMA, 43 U.S.C. § 1732(c), which allow "revocation or suspension" of a contract only after "notice and hearing."

131.     CEMEX was not provided notice and hearing prior to the BLM's revocation, cancellation, and/or rescission of its contracts.  Instead, it was presented with an already-signed decision at a meeting called by the BLM's staff.

132.     The availability of a post-cancellation appeal to the IBLA does not satisfy the requirements of Section 302 for an opportunity to be heard *prior* to the agency action, because the appeal to the IBLA was optional.  The BLM decision would have become final agency action subject to judicial review upon expiration of the 30-day deadline to request IBLA review.  *See* 43 C.F.R. § 4.21(a)(1), (c).

133.     As a result, Defendants' actions violated the APA because they were undertaken "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), entitling CEMEX to the relief requested below.

## COUNT III
### (Administrative Procedure Act – Federal Land Policy and Management Act)

134.    CEMEX incorporates paragraphs 1–112 as if fully set forth herein.

135.    The APA requires courts to set aside agency action "not in accordance with law." 5 U.S.C. § 706(2)(A).

136.    Defendants' actions violated the procedures required by Section 302(c) of FLPMA, 43 U.S.C. § 1732(c), which allow "revocation or suspension" of a contract only after "notice and hearing."

137.    CEMEX was not provided notice and hearing prior to the revocation, cancellation, and/or rescission of its contracts.  Instead, it was presented with an already-signed decision at a meeting called by the BLM's staff.

138.    The availability of a post-cancellation appeal to the IBLA does not satisfy the requirements of Section 302 for an opportunity to be heard *prior* to the agency action, because the appeal to the IBLA was optional.  The BLM decision would have become final agency action subject to judicial review upon expiration of the 30-day deadline to request IBLA review.  *See* 43 C.F.R. § 4.21(a)(1), (c).

139.    As a result, Defendants' actions violated the APA because they were "not in accordance with law," 5 U.S.C. § 706(2)(A), entitling CEMEX to the relief requested below.

## COUNT IV
### (Administrative Procedure Act – Equitable Estoppel)

140.    CEMEX incorporates paragraphs 1–112 as if fully set forth herein.

141.    The APA requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

142.     For more than 15 years, Defendants represented that the first production period had not begun, and would not begin, until all required permits necessary for legal operations were obtained.

143.     In 2015, the BLM for the first time asserted that the first production period started in 2000, at a time, as it recognized, CEMEX did not have the BLM's approval to produce and could not legally begin production.

144.     Defendants are estopped from asserting their newfound position because:

    a.   Defendants knew all the relevant facts;

    b.   Defendants intended for their conduct to be relied upon by CEMEX, and alternatively, acted in a manner such that CEMEX had a right to rely on their conduct;

    c.   CEMEX was ignorant of the newly asserted "true" fact that the first production period had actually started to run in 2000, with no notice, and affirmative contrary statements for 15 years thereafter;

    d.   CEMEX reasonably relied on those representations and invested time and resources into the Soledad project, which will constitute damages if Defendants' new position controls;

    e.   Defendants engaged in repeated affirmative misconduct by completely changing their position after years of repeatedly stating to CEMEX, the courts, Congress, and other interested parties that the production periods had not yet begun; and

    f.   Enforcing estoppel will provide CEMEX only with the rights to which it was always entitled, and which are entirely consistent with federal law.

There is no law or regulation precluding the BLM's previous, long-held, and correct view of when the first production period would begin.

145.    As a result, Defendants' actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, *see* 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, *see id*. § 706(2)(C), entitling CEMEX to the relief requested below.

## COUNT V
### (Administrative Procedure Act – Due Process)

146.    CEMEX incorporates paragraphs 1–112 as if fully set forth herein.

147.    The APA requires courts to set aside agency action "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

148.    Under the Fifth Amendment to the United States Constitution, CEMEX cannot be "deprived of [its] property, without due process of law."

149.    CEMEX entered valid contracts giving it valuable rights to extract up to 56.16 tons of minerals from the Soledad Canyon site during two ten-year production periods.

150.    From 1990 through 2015, the BLM consistently expressed the view that the 20 years of production periods had not begun.

151.    In 2015, for the first time, the BLM stated that the first production period had actually begun in 2000, the second production period was halfway over, and CEMEX owed more than $17 million in payments in lieu of royalties on extracted minerals for those years.

152.    The IBLA's 2019 decision affirmed this newfound view, with the result that there are approximately 18 months left in the second production period, too short a period to begin operations at all, let alone in a commercially reasonable manner.

153.    Defendants' actions have wrongfully deprived CEMEX of its valuable rights to mine the Soledad site without due process of law, entitling CEMEX to the relief requested below.

## PRAYER FOR RELIEF

WHEREFORE, CEMEX prays that this Court:

1.  Declare that the IBLA and BLM decisions are unlawful;

2.  Declare that neither of the production periods has yet begun;

3.  Declare that the first contract (CA-20139) has not expired by its own terms;

4.  Vacate the IBLA's decision;

5.  Vacate the BLM's decision;

6.  Order that Defendants are estopped from asserting that the first production period began to run upon issuance of the ROD;

7.  Award CEMEX its reasonable costs, including attorneys' fees, incurred in bringing this action; and

8.  Grant such further relief as this Court deems proper.

Respectfully submitted,

Dated:   May 1, 2019

*s/ Helgi C. Walker*
Helgi C. Walker, DC Bar No. 454300
hwalker@gibsondunn.com
Peter E. Seley, DC Bar No. 440936
pseley@gibsondunn.com
David A. Schnitzer, DC Bar No. 1022420
dschnitzer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Plaintiff CEMEX, Inc.*