### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CEMEX INC.,<br><br>       *Plaintiff*,<br><br>  v.<br><br>DEPARTMENT OF THE INTERIOR, et al.,<br><br>       *Defendants*. | Civil Action No. 1:19-cv-01265 (CJN) |

### <u>MEMORANDUM OPINION</u>

In 1990, Cemex purchased from the federal government the right to extract sand and gravel from a mineral deposit located in Southern California. *See* Compl., ECF No. 1 at ¶ 2. For approximately 25 years, both parties operated under the mutual understanding that the two-decade production period would not start to run until Cemex acquired the necessary permits to begin mining. *Id.* That changed in 2015 when the Bureau of Land Management informed Cemex that the production period had concluded and that Cemex owed the government millions in payments in lieu of production. *Id.* ¶¶ 8–10. Cemex moves, among other things, to set aside the government's action as arbitrary and capricious. *See generally* Pl.'s Motion for Summ. J. ("Pl.'s Mot."), ECF No. 13. The government responds with a motion for summary judgment of its own. *See generally* Defs.'s Cross-Motion for Summ. J. ("Defs.'s Mot."), ECF No. 19. The Court grants Cemex's Motion and denies the government's Motion for the reasons that follow.

### I.   Background

Located about 30 miles north of downtown Los Angeles near the city of Santa Clarita, Soledad Canyon has been used for mining since the 1960s. *See* Joint Administrative Record

Appendix ("J.A."), ECF No. 26-2 at 4.  The area contains one of the largest sand and gravel deposits in Southern California.  *Id.* at 181.  In 1989, the Bureau of Land Management held competitive bidding for contracts to extract the sand and gravel, two composite materials known in the mining world as "aggregates."  *Id.* at 113.  Transmix, Cemex's predecessor, came out on top. *Id.* at 5.

A year later, Cemex and the United States entered into two contracts.  *Id.*  The Bureau of Land Management drafted both.  *Id.*  Section 1 of the first contract (Contract CACA-20139) stated that "[t]he production period for this contract will be a maximum of ten years with an effective date beginning the day the mining plan, to be submitted by the Purchaser, is approved by the Authorized Officer."  *Id.* at 6.  Section 6 of that contract also provided that the "contract shall expire when the total amount of materials sold has been severed and removed or 10 years from the effective date of the production period unless an extension of time is granted."  Compl., ECF No. 1-3, Ex. 3 at 4.  Section 1 of the second contract (Contract CA-22901) specified, in turn, that "[t]he production period for this contract will be a maximum of ten years with an effective date of the day after expiration of Contract Serial No. [CA] 20139 between the Purchaser and the Authorized Officer."  J.A., ECF No. 26-2 at 6–7.  The two contracts taken together provide that the 10-year production period of Contract CA-22901 would run, according to its terms, following the expiration of the 10-year production period of Contract CA-20139.  In sum, Cemex's winning bid bought it two consecutive 10-year production periods, starting with the effective date under Contract CA-20139.

The contracts contained additional clauses relevant to this case.  They, for instance, required Cemex, upon production, to make "royalty" payments to the government, payable in twenty installments over the life of the contracts.  *Id.* at 6.  In the absence of any production, the

contracts required that Cemex make "payments . . . in lieu" of royalty payments.  *Id.*  The contracts also imposed several conditions before mining could begin.  Special Stipulations attached to the contracts specified that "[o]perations will not commence until activities proposed in the mining and reclamation plan are reviewed . . . and approved by the authorized officer."  J.A., ECF No. 26-6 at 159, 173.  The Stipulations also required Cemex to comply "with the rules and regulations of the South Coast Air Quality Management District," the "rules and regulations of the State of California, Regional Water Quality Control Board, Los Angeles Region," and "with the State of California Mining and Reclamation Act."  Compl., ECF No. 1-3, Ex. 3 at 6, 2 ("[Cemex] will be obligated for all terms of the contract upon signing.").

Following execution of the contracts, Cemex together with the Bureau worked through the environmental review process, which included having to come to terms on a mining and reclamation plan.  In 1991, the Bureau rejected in an internal memorandum the position that Cemex had to begin making either installment or in lieu of payments at that time, stating that the "effective date" "[i]s the date the mine plan is approved, and not the date the contract is signed (obligation date)."  J.A., ECF No. 26-6 at 181.  The memorandum provided a rationale for that conclusion: "no one would have been able to operate under the contract if the [effective] date were the date of signature . . . . If it took many years (which seems to be the case), any operator would have been under an extreme financial burden."  *Id.*  The Department of Justice later took the same position in federal court, explaining in 1997 that the United States would receive revenue from Cemex's mining operation once it began mining, and that a delay of the start date means a "consequent delay in the date the United States begins to receive royalties."  *Id.* at 242.  And in a memorandum circulated in 2000 in response to a request for information about the sand and gravel deposits the

Bureau stated that Cemex's "scheduled payments begin after all of the necessary permits have been obtained." J.A., ECF No. 26-3 at 358.

In August 2000, the Bureau executed a record of decision, approving a mining and reclamation plan. J.A., ECF No. 26-6 at 120. The record of decision not only directed Cemex on how it would excavate 56 million tons of aggregate over a 20-year period, but it also identified various terms required to commence mining. Pl.'s Mot., ECF No. 13-1 at 2–3. Approval of the plan hinged on compliance with "agency approvals and reviews" at the federal, state, and local level, "contract compliance, monitoring requirements, and bonding requirements." Compl., ECF No.1-10, Ex.10 at 8. It also stated that Cemex, "[a]s a condition of approval," must "comply with the mitigation measures specified in Appendix . . . ; the provisions of the mining reclamation plan . . . ; and . . . must consult with and obtain approvals from [] regulatory agencies . . . , and any other permits or authorizations required by law." *Id.* at 4.

The City of Santa Clarita, together with others, appealed to the Interior Board of Land Appeals the Bureau's decision to issue the record of decision. J.A., ECF No. 26-6 at 270. The Board rejected the challenges. *See generally City of Santa Clarita v. U.S. Dep't of Interior*, No. CV02-00697 DT FMOX, 2006 WL 4743970, at *3 (C.D. Cal. Jan. 30, 2006). And the Ninth Circuit affirmed the federal district court's decision rejecting them as well. *City of Santa Clarita v. U.S. Dep't of Interior*, 249 F. App'x 502 (9th Cir. 2007). In doing so, the Ninth Circuit also affirmed the federal district court's conclusion that the plaintiffs acted in "bad faith" by filing a lawsuit "to delay, obstruct and harass defendants." *Id.* at 505.

Throughout the 2000s, the Bureau together with Cemex defended the mining project against numerous other challenges. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 933 (9th Cir. 2006). While mounting the joint defense, both Cemex and the Bureau

certainly appeared to operate under the mutual understanding that the effective date of the first production period had not yet occurred.[1]  As the Central District of California explained in 2006, the record of decision "approv[ed] the Project subject to CEMEX's compliance with a myriad of mitigation, monitoring, and bonding requirements."  *City of Santa Clarita v. U.S. Dep't of Interior Bd. of Land Appeals*, No. CV04-1572 DT(FMOX), 2006 WL 4748737, at *3 (C.D. Cal. Feb. 8, 2006).  In a letter sent to Cemex that same year, the Bureau reaffirmed that the first production period would be triggered once Cemex obtained "additional agency approvals and reviews," and that "pre-production activities . . . would not trigger royalty payments or the beginning of the contract term."  Compl., ECF No. 1-12, Ex. 12 at 2.

Despite coming up short in court, the City of Santa Clarita persisted in its opposition to the project and continued to threaten recourse to litigation to halt Cemex from proceeding with its mining operation.  So, in 2007, Cemex entered into a "truce" with the City.  J.A., ECF No. 26-3 at 132.  The truce called for Cemex to pause its efforts to obtain the remaining necessary permits in exchange for the City suspending its opposition activities.  *Id.*  It also encouraged both parties to pursue federal legislation as a way "to resolve outstanding differences," cancel the contracts, compensate Cemex, and preclude mining on the site.  J.A., ECF No. 26-2 at 286.  The Bureau knew about the truce, writing to Cemex in 2008 that it had "no intention to interfere with or disrupt on-going efforts during the 'truce' to find a creative solution to this difficult issue."  J.A., ECF No. 26-4 at 29.  A year later, Cemex wrote back to the Bureau to provide an update on its continued efforts "to develop a mutually-agreeable solution to the protracted and on-going disputes relating to the Project."  *Id.* at 33.  In the same correspondence, Cemex mentioned that it had "continued to take all necessary steps to protect the status of existing permits and applications."  *Id.*

---

[1] For brevity and for clarity's sake, this Court sometimes uses "first contract" as synonymous with the "effective date" of the first production period found within that contract.

The truce fell apart years later. Cemex, in turn, continued its efforts to obtain the necessary permits to get its mining project off the ground. These efforts led to a series of meetings in 2015 with the Bureau. In March of that year, the Bureau sent Cemex a letter suggesting that, since execution of the record of decision in 2000, the company had not exercised "diligence" in carrying out the terms of the agreement. J.A., ECF No. 26-2 at 12. As the Bureau put it, Cemex's "lack of diligence in fulfilling the terms of the contracts, coupled with changed circumstances, makes a process to consider cancellation of the contracts legally available." *Id.* Cemex responded, asking whether the letter served as a notice of cancellation and, if so, requesting that the company receive "its full rights to address and cure any alleged default" under 43 C.F.R. § 3601.62. *See* J.A., ECF No. 26-2 at 13. The Bureau responded by requesting documentation showing that Cemex had taken action to meet its contractual obligations. *Id.* The company noted in reply that it continued to pursue permits and other authorizations from the relevant agencies at the federal, state, and local level. *Id.*

At an August 2015 meeting, rather than discussing a path forward, the Bureau served Cemex with a signed decision cancelling the mining contracts. *Id.* at 14. As justification, the Bureau posited that the first contract started with the execution of the record of decision in 2000. *Id.* Based on that premise, the first production period expired in 2010. As for the second contract—which, on the Bureau's view, was set to expire in 2020—the Bureau decided that that contract was subject to termination because Cemex had failed to make "reasonable progress toward commencement of production." *Id.* The Bureau also stated that Cemex owed "payments in lieu of production for a 16-year time period," since Cemex "had a contractual and legal obligation to produce or to make annual payments to the United States in lieu of production." *Id.* at 15.

Cemex appealed to the Interior Board of Land Appeals. The Board issued a decision affirming the Bureau's conclusion that the first contract had expired in 2010, ten years after issuance of the record of decision. *See Cemex, Inc.*, 194 IBLA 125 (Mar. 20, 2019). The Board concluded that though Cemex "must abide by . . . the terms of the approved mining plan in initiating and undertaking operations," the first production period commenced with the record of decision's approval and did not hinge on compliance with the regulatory requirements "necessary before operations [could] begin." *Id.* at 146. It is undisputed that the Board reached that conclusion without considering course of performance evidence between the parties over the two-decade period. As the Board put it, "[g]eneral contract law principles hold that the course of conduct of the parties to a contract is indicative of the meaning of ambiguous language in the contract. We find no ambiguity in the operative language of the Contracts now at issue," and because "the clear language of Contract CACA-20139" points in favor of the Bureau's interpretation, the Bureau's "decision [was] not arbitrary and capricious." *See* Compl. ECF No. 1-1, Ex. 1 at 24–26.

As for the second contract, the Board agreed with the Bureau that Cemex had breached because it had made neither production payments nor payments in lieu of production. *Id.* at 127. But the Board set aside the Bureau's decision cancelling the second contract and remanded for further proceedings because the Bureau never afforded Cemex "notice and an opportunity to correct the breach pursuant to 43 C.F.R. § 3601.62." *Id.* at 171.

Cemex then filed this lawsuit.[2] The company challenges the Board's decision pursuant to the Administrative Procedure Act, the Federal Land Policy and Management Act, and the Due Process Clause of the Fifth Amendment. *See generally* Compl. It has also moved for summary

---

[2] The Board's decision constituted a "final agency action for purposes of judicial review." *Aera Energy LLC v. Salazar*, 642 F.3d 212, 218 (D.C. Cir. 2011).

judgment, *See* Pl.'s Mot., and the government has filed its own motion for summary judgment, *see* Defs.'s Mot.

## II.   Jurisdiction

This Court starts where it must:  with jurisdiction.  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them").  To bring a claim against the United States, the "plaintiff must identify an unequivocal waiver of sovereign immunity." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014) (citing *FAA v. Cooper*, 566 U.S. 284, 290 (2012)).  The Administrative Procedure Act provides for the waiver of the federal government's sovereign immunity when the litigant seeks relief other than money damages.  5 U.S.C. § 702; *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 187 (D.C. Cir. 2006); *Bowen v. Massachusetts*, 487 U.S. 879, 892 (1988).  The waiver of sovereign immunity in Section 702 of the APA, however, "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'"  *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017) (quoting 5 U.S.C. § 702)); *United States v. Shaw*, 309 U.S. 495, 501 (1940) (noting that even when a federal statute waives the national government's immunity protections, a lawsuit seeking relief against the sovereign "must be brought only in designated courts," as Congress gets to dictate who may sue, what claims may be brought, when those claims may be brought, and where they may be filed).

The Tucker Act waives the federal government's sovereign immunity for some claims "founded . . . upon" a contract and brought in the Court of Federal Claims.  28 U.S.C. § 1491(a)(1).  The Court of Federal Claims, like all federal courts, is one of "limited jurisdiction." *Giesecke+Devrient GmbH v. United States*, 150 Fed. Cl. 330, 338, 341 (2020).  Congress, however, limited the jurisdictional scope of the Court of Federal Claims to a greater extent than

other federal courts.  *Id.* at 342.  Generally speaking, the Court of Federal Claims possesses exclusive jurisdiction to hear claims sounding in contract for monetary relief brought against the federal government.  *Id.*  But claims outside that grant of jurisdiction cannot be brought there. *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176–77 (D.C. Cir. 2006) ("Put plainly, the Court of Federal Claims can have exclusive jurisdiction only with respect to matters that Congress has proclaimed are within its jurisdictional compass.").

The government argued for the first time in its reply in support of its cross-motion for summary judgment that the Tucker Act grants only the Court of Federal Claims the authority to decide this case.  Def.'s Reply in Supp. Cross-Mot. for Summ. J., ECF No. 23 at 6–7; 28 U.S.C. § 1491.[3]  The syllogism of the government's argument goes something like this: (1) the APA's waiver of sovereign immunity does not apply where the Tucker Act bars federal district courts from exercising jurisdiction, (2) federal district courts lack jurisdiction where a litigant files a lawsuit against the federal government for breach of contract, (3) Cemex has sued the federal government for breach of contract, (4) so this Court, unlike the Court of Federal Claims, lacks jurisdiction to hear Cemex's claims.  Though this argument might have some surface appeal, it is ultimately unpersuasive.  Indeed, the government essentially conceded at oral argument that the Court has jurisdiction.  *See* April 14, 2021 Minute Order.  There are several reasons why that was a wise concession.

First, the Court of Federal Claims lacks jurisdiction to review decisions of the Interior Board of Land Appeals.  As the Federal Circuit has explained: "This court, just as the Claims Court, is a court of limited jurisdiction and lacks jurisdiction to review decisions of the Interior

---

[3] Though the government raised a challenge to this Court's jurisdiction for the first time in its reply in support of its cross-motion for summary judgment, that belated argument "goes to the district court's subject-matter jurisdiction and cannot be waived."  *United States v. Miranda*, 780 F.3d 1185, 1189 (D.C. Cir. 2015).

Board."  *Underwood Livestock, Inc. v. United States*, 417 F. App'x 934, 939 (Fed. Cir. 2011);

*Taylor Energy Co. LLC v. United States*, 975 F.3d 1303, 1311 n.6 (Fed. Cir. 2020) ("Neither the

Claims Court nor this court is empowered to review IBLA decisions.");  *Griffin & Griffin Expl.,*

*LLC v. United States*, 116 Fed. Cl. 163, 172 (2014) (agreeing with the government's observation

that "Congress has invested the federal district courts with exclusive jurisdiction to review IBLA

decisions pursuant to the Administrative Procedure Act").

  Second, the Court of Federal Claims ordinarily lacks jurisdiction to entertain due process

claims.  *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (citation omitted);

*Gahagan v. United States*, 72 Fed. Cl. 157, 163 (2006) ("The Court of Federal Claims ordinarily

lacks jurisdiction over due process claims under the Tucker Act."); *Agee v. United States*, 72 Fed.

Cl. 284, 289 (2006).  Cemex pleads Fifth Amendment due process violations in its complaint.  *See*

Compl. ¶¶ 1, 11, 28.  This Court has jurisdiction over due process claims pursuant to the APA.

*See Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 606 (D.C. Cir. 1992),

*abrogated in part on other grounds as recognized in Perry Capital LLC v. Mnuchin*, 864 F.3d 591,

620 (D.C. Cir. 2017) (rejecting the argument that Tucker Act stripped the district court of

jurisdiction because the plaintiff brought due process claims, which granted the court jurisdiction

to hear those claims under the Administrative Procedure Act)).  A different rule here might

otherwise leave a litigant like Cemex with no forum to raise a colorable constitutional claim.  *See*

*Elgin v. Dep't of Treasury*, 567 U.S. 1, 9 (2012).

  Third, just because Cemex seeks a remedy that would force the government to obey

contractual terms does not transform this controversy into a Tucker Act case.  When a plaintiff's

claims stem *only* from a contract (and certainly only for damages for the government's breach of

contract) then the case may well be suited for the Court of Federal Claims.  *Transohio*, 967 F.2d

at 609.  That is, when a case "turns *entirely* on the terms of a contract," *Albrecht v. Comm. on Emp.*

*Benefits*, 357 F.3d 62, 69 (D.C. Cir. 2004) (emphasis original), then only the Court of Federal

Claims may entertain the suit, *id.*  But when claims stem from something more than just a contract,

say the Constitution or the APA, then the litigant may bring the claims in "federal district court

even when the claims depend on the existence and terms of a contract with the government."  *Id.*

at 610.  Cemex's case turns on more than just contractual terms.[4]

In sum, this Court for several reasons has jurisdiction over this case.

### III.   Standard of Review

The Administrative Procedure Act provides that a court must set aside agency action that

is "arbitrary, capricious, an abuse of discretion, or" made "without observance of procedure

required by law."  5 U.S.C. § 706(2)(A), (D).  An agency's action is arbitrary and capricious if it

"has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court presumes the validity of agency action,

*see, e.g., Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000), and will not "substitute [its]

---

[4] The Court pauses to make two additional points.  First, a litigant may not elude the Court of Federal Claims' exclusive jurisdictional purview by "disguising" contract claims as something else.  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982).  To determine the nature of a claim, courts must "examine the source of the rights upon which the plaintiff bases its claims and the type of relief sought."  *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quotation omitted).  Where, as here, the case involves claims based on the APA and the federal constitution, this Court may exert jurisdiction even though the case involves a contract between a private party and the federal government.  *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 6 (D.C. Cir. 1998).  Second, Cemex does not seek money damages.  *See* Compl. ¶ 18 (stating that the relief requested "does not include money damages").  That fact further confirms that the Court may exercise jurisdiction over the company's claims.  *See McKoy v. Spencer*, 271 F. Supp. 3d 25, 34 (D.D.C. 2017).

judgment for that of the agency," *Sioux Valley Rural Television v. F.C.C.*, 349 F.3d 667, 679 (D.C. Cir. 2003).

An agency's judgment and exercise of discretion must turn on reasoned decisionmaking. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). The agency must give explanations for changing course, *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017), and take into consideration reliance interests before tacking in a different direction, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Simply put, the motions for summary judgment before this Court serve as mechanisms "for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Rodriguez v. Penrod*, No. 1:18-CV-00240 (CJN), 2020 WL 686012, at *6 (D.D.C. Feb. 11, 2020), *aff'd sub nom. Rodriguez v. Blanks*, 852 F. App'x 13 (D.C. Cir. 2021) (quotation omitted)).

## IV.    The Contractual Dispute

Whether the challenged agency action in this case was arbitrary and capricious turns on the meaning of contractual language and how to go about interpreting it. The government contends that this dispute starts and stops with Section 1 of Contract CACA-20139, which states that "[t]he production period for this contract will be a maximum of ten years *with an effective date beginning the day the mining plan*, to be submitted by the Purchaser, *is approved by the Authorized Officer*." J.A., ECF No. 26-2 at 6 (emphasis added). According to the Bureau, in reasoning later adopted by the Board, the first contract triggered when the authorizing officer approved the mining plan with the issuance of the record of decision in 2000, meaning that the original ten-year period ran by 2010. In contrast, Cemex points to surrounding provisions in the contract and later incorporated terms and conditions that require the company to comply with various regulations at the federal,

state, and local level before mining could commence as textual indicators that the first contract became effective only after mining had begun. Cemex also highlights evidence of the course of performance over a two-decade period as an indication that the record of decision conditioned approval of the mining plan on satisfaction of regulatory and permitting requirements. And alternatively, if one were to assume ambiguity, Cemex contends that course of performance evidence elucidates the interplay of the contractual language and the record of decision.

The principles of law applicable to contracts between private individuals govern contracts between a corporation and the government. *Reading Steel Casting Co. v. United States*, 268 U.S. 186 (1925); *Fomby-Denson v. Dep't of Army*, 247 F.3d 1366, 1373 (Fed. Cir. 2001) (noting that the principles of general contract law, "which become federal common law," apply to government contracts). A court starts with the agreement's express terms when construing its meaning. *See Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc). Contract terms are not, however, read in isolation. *Yates v. United States*, 574 U.S. 528, 543 (2015) ("[A] word is known by the company it keeps."). Courts instead read words and provisions in context, giving meaning to all contract terms. *Pigford v. Vilsack*, 777 F.3d 509, 516 (D.C. Cir. 2015) (citing Restatement (Second) of Contracts § 202(1)–(2)) ("A written agreement must be interpreted as a whole, with all words interpreted in the light of the circumstances.")); *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996).

The plain meaning of the contract, read together with the record of decision and the incorporated terms and conditions of the mining plan, suggest that approval of the record of decision did not trigger the first contract's effective date.[5] The contract, read as a whole, provides that the first "production period" will have an "effective date beginning the day the mining plan .

---

[5] 43 CFR § 3601.43(a) ("You must follow BLM-approved mining and reclamation plans, which become part of the contract.").

. . is approved by the" Bureau, and it includes stipulations that mining "operations will not commence until activities proposed in the mining and reclamation plan . . . are [likewise] approved." J.A., ECF No. 26-6 at 159, 173.  Additional language also provides that Cemex "must comply with the rules and regulations" issued by the relevant agencies before it can begin mining. *Id.* at 159, 173.  The record of decision likewise makes clear, under the subheading "[c]onditions of the approval," that "[a]s a condition of approval, [Cemex] is required to comply with all of . . . the provisions relating to the additional agency approvals and reviews."  J.A., ECF No. 26-5 at 491.  It also specifies that Cemex "must consult with" various agencies and "obtain" various approvals before operations can begin.  *Id.* at 487.  Taken together, those provisions suggest that the record of decision authorized in 2000 could not trigger the "production period" because the contract conditioned the start of that period on the receipt of permits and approvals from state, local, and federal agencies.

The terms of the mining plan reinforce this reading.  The plan contemplates twenty years of actual production, *id.* at 393, and it also provides a list of "anticipated agency approvals required to implement the" project, *id.* at 345.  Similarly, the plan specifies that "[Cemex]'s current Federal Contracts with the BLM will expire at the end of the 20th year of operation."  *Id.* at 387.  It therefore seems somewhat clear, though not indisputably so, that Cemex acquired a right to mine the site for a combined period of twenty years, once the project was approved by the various federal, state, and local governmental authorities.

Despite the text tilting in Cemex's direction, the Court does not decide that the Board's decision was arbitrary and capricious on that ground.  Instead, the Court concludes that the Board erred as a matter of law in failing to consider evidence of course of performance.  The Court looks to the Restatement (Second) of Contracts in cases involving federal government contracts.  *Curtin*

*v. United Airlines, Inc.*, 275 F.3d 88, 94 n.6 (D.C. Cir. 2001); *Bowden v. United States*, 106 F.3d 433, 439 (D.C. Cir. 1997) (explaining that the principles of the Restatement (Second) of Contracts are those "from which we would be inclined to fashion a federal common-law rule").  Under the Restatement, courts may look to evidence of "course of performance" for interpretative assistance even when the contractual language contains no ambiguity.  *See* Restatement (Second) of Contracts *id.* § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."); *id.* § 223 cmt. b ("There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown . . . ."); *id.* § 220 cmt. d ("There is no requirement that an ambiguity be shown before usage can be shown . . . ."); *S. Dakota Pub. Utilities Comm'n v. F.E.R.C.*, 934 F.2d 346, 352 (D.C. Cir. 1991) (looking to "course of performance evidence" for interpretative assistance).

Course of performance "refers to actions with respect to the contract taken after the contract has formed."[6]  *3E Mobile, LLC v. Glob. Cellular, Inc.*, No. 14-CV-1975 (GMH), 2019 WL 1253455, at *17 n.22 (D.D.C. Mar. 19, 2019), *aff'd*, 798 F. App'x 651 (D.C. Cir. 2020) (cleaned up).  It, in other words, "relates to the way the parties have acted in performance of the particular contract in question," 2A Anderson U.C.C. § 1-205:69 (3d. ed. 2021), but "not to a general pattern of dealing that may embrace other contracts or transactions," *id.* § 1-205:71.  Although a "single occasion of conduct" does not establish evidence of course of performance, *Stanford Hosp. &*

---

[6] The Court acknowledges the differences between course of dealing and course of performance.  A course of dealing "relates to conduct that has occurred prior to the execution of the particular agreement or contract, as contrasted with course of performance, which relates to the conduct of the parties in performance of the contract." 2A Anderson U.C.C. § 1-205:71 (3d. ed. 2021); *see also 3E Mobile, LLC*, 2019 WL 1253455, at *17 n.22 (unpacking the difference).

*Clinics v. N.L.R.B.*, 370 F.3d 1210, 1214 (D.C. Cir. 2004) (citation omitted), such evidence when it does exist "is considered the best indication of what [the parties] intended the writing to mean." 2A Anderson U.C.C. § 1-205:68 (3d. ed. 2021).   As the Court of Appeals recently put it:  "[T]he parties' conduct in carrying out the agreement, can aid in discerning what the parties meant by the words they used."  *Ramsey v. United States Parole Comm'n*, 840 F.3d 853, 860 (D.C. Cir. 2016) (citing Restatement (Second) of Contracts § 203(b)).

The Board erred as a matter of law when it declined altogether to consider course of performance evidence.  In its decision, the Board stated that "[g]eneral contract law principles hold that the course of conduct of the parties to a contract is indicative of the meaning of *ambiguous* language in the contract.  We find no *ambiguity* in the operative language of the Contracts now at issue," Compl. ECF No. 1-1, Ex. 1 at 24–26 (emphasis added); *see also id.* (noting that because "the clear language of Contract CACA-20139" points in favor of the Bureau's interpretation, the Bureau's "decision [was] not arbitrary and capricious").  The Board erred in requiring contract ambiguity before considering course of performance evidence.

This error may have affected the Board's ultimate decision.  After all, the Parties' actions and conduct after the contracts were executed strongly suggest that all parties understood that the first production period did not trigger with the authorization of the record of decision in 2000.  Consider just some of the record evidence between the year of contract formation (1990) and the year the Bureau cancelled the contract (2015).  In 1991, the Bureau explained that the contracts are "structured in a way that only allows further payments if production is authorized," and that to require payments prior to that would be "an undue," "unplanned," and "extreme financial burden," and "no one would have been able to operate under" such an arrangement, J.A., ECF No. 26-6 at 181.  In 2006, the Bureau wrote that the approval of the mine plan in 2000 "was conditioned upon

the requirement to obtain additional agency approvals and reviews.  Also, it appears reasonable that the site preparatory work and pre-production activities described in your letter would not trigger royalty payments or the beginning of the contract term."  Compl., ECF No. 1-12, Ex. 12 at 2.  Three years later, the Bureau asked Cemex about the status of "necessary pre-mining activities that will not trigger the 10-year terms of the Federal contracts." Compl., ECF No. 1-13, Ex. 13 at 2.  And in one of its final pieces of correspondence with Cemex before cancelling the contracts in 2015, the Bureau stated that its 2000 approval "is subject to significant conditions," and explained that it had provided "conditional approval" and had "conditionally approved the mining project." J.A., ECF No. 26-4 at 52.  Consider, too, that the Bureau did not request payments in lieu of production until 2015, which suggests that the Bureau understood that the production period had not yet begun to run with the authorization or the record of decision in 2000.[7]

The argument that the parol evidence rule precludes the use of course of performance evidence for interpretative assistance conflicts with black letter contract law.  The parol evidence rule "provides that when parties to a contract have executed a (1) completely integrated written agreement with (2) terms that are plain and unambiguous, no evidence of *prior* or *contemporaneous agreements or negotiations* may be admitted which would either contradict or add to the writing."  *Regan v. Spicer HB, LLC*, 134 F. Supp. 3d 21, 32 (D.D.C. 2015) (emphasis added).  The rule, in other words, "renders inoperative *prior* written agreements as well as *prior* oral agreements."  Restatement (Second) of Contracts § 213 cmt. a (emphasis added).  First off, the parties' *subsequent* communications and actions here do not count as *prior* agreements.

---

[7] The Court rejects any suggestion that the Board's misstatement of the law amounted to harmless error.  *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) ("The harmless error rule applies to agency action because '[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.'") (citation omitted).  Where, as here, "a mistake infects the agency's analysis or the outcome of the adjudication, it crosses the [harmless error] line into arbitrary and capricious territory."  *PAM Squared At Texarkana, LLC v. Azar*, 436 F. Supp. 3d 52, 59 (D.D.C. 2020).

Secondly, though agreed upon contractual language "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement[, the language] may be explained or supplemented: (a) by course of performance" evidence.  U.C.C. § 2-202; *Radiation Sys., Inc. v. Amplicon, Inc.*, 882 F. Supp. 1101, 1103 (D.D.C. 1995) ("Although the express terms may not be contradicted by prior or contemporaneous agreements, they may be explained or supplemented by evidence of a course of performance.").

The government's argument that "[j]ust because operations are not allowed to commence until the mining plan is approved does not mean that mining operations must be able to commence when the mining plan is approved" fails to take account of course of performance evidence.  Def.'s Reply in Supp. of Cross-Motion for Summ. J., ECF No. 23 at 15.  Reading the contractual language in a vacuum divorced from party performance may lead a reasonable interpreter to conclude that even though "the approval of the mining plan is a condition necessary to begin operations, it is not a condition sufficient to begin operations." *Id.*  But course of performance evidence muddies the attempt to divorce conditional approval of the mining plan from satisfaction of the conditions.

Because the government failed to adequately consider course of performance evidence, the Court need not resolve whether the government's interpretation of the contractual language merits deference.  In any event, the case law seems to cut against deferring to a self-interested agency's reading of its own contract.  At a minimum, "[w]hether *Chevron*-type deference warrants a place in the canons of contract interpretation is surely open to dispute." *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 138 S. Ct. 2, 2 (2017) (statement of Gorsuch, J., joined by Roberts, C.J., and Alito, J., respecting the denial of certiorari).  Indeed, "[w]hat's the case for supposing that Congress implicitly delegates to agencies the power to adjudicate their own contractual disputes . . . ?" *Id.*  Judge Bork stated long ago that where "the agency itself [is] an interested party to the agreement,

deference might lead a court to endorse self-serving views that an agency might offer in a post hoc reinterpretation of its contract." *Nat'l Fuel Gas Supply Corp. v. F.E.R.C.*, 811 F.2d 1563, 1571 (D.C. Cir. 1987); *Se. Fed. Power Customers, Inc. v. Geren*, 514 F.3d 1316, 1327 (D.C. Cir. 2008) (Silberman, J., concurring in the judgment) ("[D]eference is inappropriate where—as here—the agency itself [was] an interested party to the agreement.") (quotation omitted)); *Dalles Irr. Dist. v. United States*, 82 Fed. Cl. 346, 359 (2008) ("There is support for the . . . position that an 'agency['s] interpretations of its own contracts do not require judicial deference.'"). The Federal Circuit has likewise explained that "[w]hen a party enters into a contract with the government, that party should reasonably expect to be on equal legal footing with the government should a dispute over the contract arise." *S. Cal. Edison Co. v. United States*, 226 F.3d 1349, 1357 (Fed. Cir. 2000); *see also* Lindsey Simon, *Chapter 11 Shapeshifters*, 68 Admin. L. Rev. 233, 283–84 (2016) (quotation omitted) ("It has also long been observed that an agency may act for its own self-benefit, and such actions should receive less deference: It would exceed the bounds of fair play to allow an institutionally self-interested advocacy position, which may properly carry a bias, to control the judicial outcome."); Timothy K. Armstrong, *Chevron Deference and Agency Self-Interest*, 13 Cornell J.L. & Pub. Pol'y 203, 287 (2004) ("It does appear that, where agency self-interest is implicated, judicial deference to agencies' contractual interpretations is at its nadir.").

The Court recognizes that the Board—as opposed to the Bureau—may not qualify as an "interested party" because it is not a party to the contract and is composed of administrative law judges. But both the Bureau and the Board are part of the Department of Interior, which of course places both squarely within Article II. Moreover, when courts do defer to an agency's position, such deference is typically granted to the drafter of the relevant regulation or rule. Here, the Bureau, not the Board, drafted the first contract. It would be anomalous to defer to the Board's

interpretation of the contract when Congress gave it no role in drafting the language.  *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1157 (10th Cir. 2016) (Gorsuch, J., concurring) (noting that "the Court added a 'step zero' to the *Chevron* sequence," which asks whether the agency interpretation is of the sort that warrants deference in the first place).

One last point.  Though the Court does not decide this case on due process grounds, those grounds would likely provide an independent basis for the outcome here.  When an agency's "prior policy . . . engendered serious reliance interests," due process considerations of fair notice and fundamental fairness demand a reasonable explanation for the agency's change in position.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  The agency also "must … take into account" reliance interests when changing course.  *Id.* at 515–16.  Failing to do so may result in arbitrary and capricious agency action.  *Id.*  Neither the Board nor the Bureau accounted for Cemex's reliance on the shared understanding that the production period would not trigger until mining commenced.  Where, as here, Cemex has a proven and identified reliance interest connected to the Bureau's communications over the course of multiple decades, it may have been arbitrary and capricious for the agency not to adequately consider the company's reliance interest.  *See Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020).  The Board failed to grapple with Cemex's investment in the project based on the Bureau's repeated assurances that the first production period had not begun.  It also failed to consider the reality that Cemex likely would have altered its conduct if it had known that the production period began to run in 2000.

## V.    The Remedy

Ordinarily, a court vacates unlawful agency action.  *See id.* § 706(2) ("The reviewing court shall . . . set aside agency action . . . found to be" unlawful.).  In "rare cases," however, courts may instead remand "for the agency to correct its errors."  *United Steel v. Mine Safety & Health Admin.*,

925 F.3d 1279, 1287 (D.C. Cir. 2019); *see also* 5 U.S.C. § 702 ("Nothing herein . . . affects . . . the power or duty of the court to . . . deny relief on any . . . appropriate . . . equitable ground . . . ."). Two factors dictate the appropriateness of the remand-without-vacatur remedy: "[F]irst, the seriousness of the [action's] deficiencies, and, second, the likely disruptive consequences of vacatur." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020) (internal quotation marks, brackets, and ellipses omitted). A strong showing of one factor may obviate the need to find a similar showing of the other. *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 160 (2020).[8]

In only a few pages dedicated to the remedy issue, Cemex argues that the Court should vacate not just the Board's decision, but also the Bureau's underlying decision—and indeed direct that the full production period must be reinstated because the agency could not reach any other outcome. The government apparently argues the opposite (though the government's briefs barely mention the remedy question), asking for a remand only so that the Board can try again. The Court declines to answer the remedy question today in light of the inadequate briefing on the issue.

The Court instead orders additional briefing on what remedy is appropriate in light of its conclusion that the Board erred in failing to take into consideration course of performance evidence. In particular, the Parties should address whether it is appropriate to remand only; to vacate the Board's decision only; or to vacate both the Board's decisions and the Bureau's action. (The Parties need not address Cemex's argument that the Court should take the additional step of

---

[8] The remand-without-vacatur remedy has received criticism from some corners. As many on the Court of Appeals have explained: "[E]xperience suggests that [remand without vacatur] sometimes invites agency indifference." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring); *see Natural Res. Def. Council v. EPA*, 489 F.3d 1250, 1262–64 (D.C.Cir.2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) (noting that if a court orders remand without vacatur "agencies often delay or decline to take action").

holding that the agencies could never reach any outcome other than that the full production period is still intact.)

## VI.   Conclusion

For the foregoing reasons, Cemex's Motion for Summary Judgment is **GRANTED**.  The government's Cross-Motion for Summary Judgment is **DENIED**.  The Court **ORDERS** additional briefing to address the appropriate remedy in light of the conclusion that the Board's decision not to consider course of performance evidence was arbitrary and capricious.  An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  September 15, 2021

CARL J. NICHOLS
United States District Judge